**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, <br><br> Plaintiff, <br><br> v. <br><br> NORFOLK SOUTHERN RAILWAY COMPANY, <br><br> Defendant. | CASE NO. 1:21-cv-01866 <br><br> JUDGE DAVID A. RUIZ <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET") initiated the present action against Defendant Norfolk Southern Railway Company ("NSR"). (R. 1). NSR responded by filing an Answer and Counterclaim. (R. 3). The matter was reassigned to the undersigned District Judge and following a telephone conference the Court established a limited discovery and briefing schedule for the parties' cross motions for summary judgment. (R. 29). All pending motions at that juncture were denied without prejudice as moot. (R. 30). The parties have received multiple extensions of time for discovery while considering potential resolution. Now pending before the Court are the following: the parties Joint Stipulated Facts and Stipulated

Record (R. 43),[1] the parties' respective motions for summary judgment (R. 45 & 47), their respective briefs in opposition (R. 49 & 50), and their respective reply briefs. (R. 51 & 52).

In short, Plaintiff accuses Defendant of unilaterally altering the existing collective bargaining agreement ("CBA") without bargaining pursuant to Section 6 of the Railway Labor Act ("RLA"). (R. 47-1). Conversely, Defendant asserts that the practice of calling Engineers, who maintain Conductor seniority, to fill temporary Conductor[2] vacancies is a decades-old practice that only amounts to a "minor dispute" in the parlance of the RLA, and deprives this Court of subject-matter jurisdiction. (R. 45-1).

## I. Relevant Facts

Plaintiff BLET is a labor organization and is the exclusive collective bargaining representative for employees of Defendant NSR holding the craft or class designation of "Engineers". (R. 43, PageID# 691). Defendant NSR is a "carrier" as defined by the RLA. *Id*. BLET and NSR are parties to several collective bargaining agreements that, in part, govern the rates of pay, rules, and working conditions of NSR's employees who are represented by the Union. (R. 43, PageID# 692). The union SMART-TD is the duly authorized representative of employees holding the designation of "Conductors," and is a successor to the United Transportation Union (UTU). *Id*.

Prior collective bargaining agreements between BLET, SMART-TD and NSR, eliminated the craft designation of Fireman, and new Engineers are promoted from the

---

[1] The parties were only able to agree on the most basic facts despite the lengthy period of discovery.

[2] The Court notes that a parallel lawsuit was filed by the SMART-TD, which represents the conductors, in case No. 1:21-cv-1870 against the same Defendant—Norfolk Southern, which is also before this Court. While the Court addresses these lawsuits separately, the Court is mindful of the interplay between these two crafts and their common employer.

Conductors craft. (R. 45-2, PageID# 726, Decl. of Andrew Shepard at ¶5).[3] Engineers hired after November 1, 1985—virtually all engineers—hold seniority both as Engineers and as Conductors, and "such employees who are qualified and hold seniority in both crafts are required to fill or – in railroad terminology – 'protect' vacancies in either craft, depending on the needs of service and the employee's seniority." *Id*. at ¶¶5, 10. Under current labor agreements, Defendant must assign *both* an Engineer and a Conductor to most trains, and an unfilled vacancy in either craft prevents the train from moving. *Id*. at ¶5.[4]

A.   **Precursors to the Present Dispute**

The dispute over whether the railroad has "the right to use engineers to fill conductor vacancies" is not new. As early as 1991, a neutral arbitrator addressed a situation where an engineer on the extra list was called to work as an emergency conductor, but "refused to protect the job stating that he did not have to go since he was on an engineer's list." (R. 45-2, PageID# 803, Exh. N, Award No. 32 of Public Law Board 4417). The Board found that "claimant failed to respond to a call as conductor based upon the Conductor's working agreement. He was obligated to protect his seniority." *Id*.

In 1993, "BLE (BLET's predecessor) advanced a grievance or 'claim' on behalf of an employee who held a position as an Engineer, claiming that NSR erred by not calling him to fill a Conductor vacancy." (R. 45-2, PageID# 730, Shepard Decl. at ¶20). The parties "mutually agreed" as follows:

---

[3] Andrew Shepard is an Assistant Vice President of Labor Relations for the parent company of Defendant NSR. (R. 45-2, PageID# 724, Shepard Decl. at ¶1).
[4] Engineers who are working as Conductors are referred to as "demoted Engineers," and his or her rate of pay, while working as a Conductor, are governed by the collective bargaining agreement between NSR and with SMART-TD, which represents Conductors. (R. 45-2, PageID# 728, Shepard Decl. at ¶11).

> [C]onductor and trainman positions will be filled in emergency by utilizing to the fullest extent employees in the ranks of conductor and trainman prior to utilizing the engineers extra list. **When the needs of the service require the utilization of the engineer's extra list** to fill such assignments in emergency **a conductor and trainman will be called from that list in seniority order** to fill such emergency vacancies.

(R. 45-2, PageID# 779, Exh. D).

The same issue was again referenced in a November of 2000 letter to the then chairman of Plaintiff BLET, wherein Defendant asserted as follows:

> It is well settled on this property that the Carrier has the right to use engineers to fill conductor vacancies. This right is confirmed by prior understandings, time claims, claim settlements, and arbitration decisions with your Organization. In light of the above, there is absolutely no basis for your assertion that this issue rises to the level of a major dispute.
>
> ***
>
> The Carrier has consistently maintained that engineers must protect their seniority as conductors in emergency situations. The Carrier's practice has been to only use engineers in order of their conductor seniority when all train service sources of supply have been exhausted. When a engineer has been called in this manner the Carrier has paid engineers the engineer rate of pay. The Carrier's practice has been known to your committee for more than ten years and was accepted by the previous general chairman.

(R. 45-2, PageID# 781, Exh. E).[5]

In 2003, a letter to the then chairman of Plaintiff BLET from Defendant asserted that "[t]he Carrier has consistently maintained and arbitral decisions have upheld that engineers must protect their seniority as conductors in emergency situations. The Carrier's practice for at least fifteen years has been to use engineers in the order of their conductor seniority when all train

---

[5] The Court does not cite this letter for the truth of the contents therein, but rather to illustrate that this issue apparently has been a source of contention for over thirty years, and that Defendant's position, whether permissible under the relevant agreements, was well-known to Plaintiff.

4

service sources of supply have been exhausted." (R. 45-2, PageID# 783, Exh. F). In the same year, a Public Law Board addressed the scenario where a demoted engineer was removed from the Conductor extra list and required to accept a call for an emergency engineer vacancy. (R. 45-2, PageID# 822, Exh. R, Award No. 1 of Public Law Board 6619). The Board observed as follows:

> As stated previously, this Board's authority is limited to resolving the claims before it. However, we urge the parties to continue their previous broad discussions on this general topic as detailed in the Organization's submission and to reach an agreement to avoid any continuing future disputes on the manner, extent, pay and discipline regarding the utilization of demoted engineers working under the Conductors' Schedule Agreement who are utilized to protect, temporary engineer assignments.
>
> ***
>
> Scenarios similar to those involving Mr. *** and Mr. *** could also be dealt with by agreement of the parties as they are likely to occur again.

(R. 45-2, PageID# 825, Exh. R).

In 2009, a neutral arbitrator upheld discipline against a demoted engineer, who had been working as a conductor, when he refused to protect an assignment as an engineer. (R. 45-2, PageID# 805, Exh. O, Award No. 75 of Public Law Board 7159).

In 2011, a dispute existed between SMART-TD's predecessor and Defendant NSR concerning whether a furloughed conductor should have been called to fill a temporary vacancy over an engineer. (R. 45-2, PageID# 807, Exh. P, Award No. 76 of Public Law Board 5811). The neutral arbitrator noted that "[i]t has been held on a number of occasions over the years that there may be occasion for an employee from a different class or craft of service to be used for a temporary vacancy when no one is available to fill a must need position." *Id*.

5

**B.     2015 Collective Bargaining Agreement**

A collective bargaining agreement between the parties became effective February 21, 2015 ("2015 CBA"), and a true an accurate copy is attached to the Complaint as Exhibit A. (R. 43, PageID# 693; R. 1-2). Article V of the 2015 CBA contains a Predictable Workforce Scheduling (PWS) provision, which states:

> Predictable Workforce Scheduling (PWS) will serve as the ***exclusive method*** to assign ***engineers*** on a weekly cycle based on seniority, qualifications and job preferences. PWS permits engineers to select jobs weekly and provides engineers predictable scheduling and income stability because their job assignments cannot be changed until the next weekly cycle.

(R. 1-2, PageID# 22; R. 45-2, PageID# 828) (emphasis added). "The only assignments NSR makes through PWS are assignments to work as Engineers on NSR locomotives." (R. 43, PageID# 693).

Here, in the Verified Complaint, Plaintiff asserts that under the first six years of the 2015 CBA, engineers were never forced to accept conductor assignments. (R. 1, PageID# 4, ¶14). The practice of calling engineers, demoted or otherwise—whether voluntarily or involuntarily—is not addressed anywhere in the 2015 CBA, or in Appendix I which addresses PWS. (R. 1-2, PageID# 16-34).

The parties' "Agreed to Questions & Answers" concerning Professional Performance Incentive ("PPI") does expressly contemplate that individuals working as Engineers could also work in "other crafts:"

> Q3: How will engineers *who work as an engineer and in other crafts* during the same quarter be handled for PPI eligibility?
>
> A3: The performance criteria will be based on service as an engineer. The calculation of the incentive amount will be based on engineer earnings as defined by Article III, Section 2(b) of this Agreement.

> Q4: How will DDOs [Designated Days Off] be handled when an engineer is working in another craft?
>
> A4: A DDO may only be scheduled and taken when an engineer is holding an engineer assignment.

(R. 45-2, PageID# 837-838, Exh. U) (emphasis added).

**C.      2016 Flowback Agreements**

In 2016, after the 2015 CBA, Defendant NSR, Plaintiff BLET, and three of the four SMART-TD General Committees of Adjustment entered into amended "Flowback Agreements," that allowed Engineers to "flowback" and work as Conductors. (R. 45-2, PageID# 728, Shepard Decl. ¶12). Two of the three 2016 Flowback Agreements contain the following language:

> When it becomes necessary to reduce the number of engineers at a location/supply point, engineers designated as flowback engineers will be returned to train service (in engineer's seniority order) ahead of other engineers. If the reduction in engineers at a location/supply point exceeds the number of engineers designated as flowback **or there are no engineers designated as flowback at the location /supply point, engineers who are not designated as flowback will be sent to train service in reverse seniority order**.
>
> The parties agree that the process by which temporary engineer vacancies are filled remains unchanged by the terms of this Agreement, except engineers in train service as a result of this Agreement will be called after other demoted engineers to protect temporary engineer vacancies.

(R. 45-2, PageID# 769, 774, Exh. C) (emphasis added). While the agreements are not a model of clarity, they generally "provide for the flowback of employees from engine to train service." (R. 45-2, PageID# 767, Exh. C).

## II. Legal Standard

In order to address the parties' motions for summary judgment, the Court must first decide if the parties have a major or minor dispute. Congress created separate mechanisms to resolve major and minor disputes in an effort to "prevent labor unrest and interruption of

7

interstate commerce." *Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Engineers and Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015); *accord Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div. v. CXS Transp., Inc.*, No. 1:21-cv-1240, 2022 U.S. Dist. LEXIS 30283 (N.D. Ohio, Feb. 21, 2022) (Gwin, J.) The Sixth Circuit Court of Appeals explained as follows:

> Major disputes rest on the authority of 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156, and relate to disagreements over the formation of collective bargaining agreements (CBAs) or efforts to procure them. Such disputes arise where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. The issue in a major dispute is not whether an existing agreement controls the controversy; instead, the focus is on the acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past.
>
> ***
>
> By contrast, minor disputes are predicated on 45 U.S.C. § 152 Sixth and 45 U.S.C. § 153 First. A minor dispute contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The parties' dispute concerns a grievance about either the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. If the dispute centers on an omitted case, the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement. Whether the parties' dispute relates to application of a particular CBA provision in a specific situation or to application of a CBA provision to an omitted case, the claim is to rights accrued, not merely to have new ones created for the future. Minor disputes inevitably appear in executing major agreements and policies or arise incidentally in the course of an employment. They relate to specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so.
>
> The RLA directs parties to negotiate a minor dispute, but if negotiation is unsuccessful, the procedural pathway set out for **minor disputes requires the parties to submit the dispute to compulsory and binding arbitration** before the National Railroad Adjustment Board (NRAB) or, alternatively, to an adjustment board established by the carrier and the employees.

*Wheeling & Lake Erie Ry. Co.*, 789 F.3d at 691 (internal citations and quotation marks omitted)

(emphasis added); *accord Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108 (Flight Options II)*, 873 F.3d 540, 544 (6th Cir. 2017) ("Minor disputes … arise from disagreements about how an existing collective-bargaining agreement applies to a particular situation. Again, the parties must first attempt to negotiate privately. But if negotiations over a minor dispute fail, the parties must proceed directly to binding arbitration. The court plays no role in resolving minor disputes unless a party asks it to review the arbitrator's decision.") (citations omitted). As the Supreme Court has explained, "major disputes seek to create contractual rights, minor disputes to enforce them." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 2480, 105 L. Ed. 2d 250 (1989).

The Sixth Circuit has echoed that principle, stating "**The core distinction between these two types of disputes is that major disputes seek to create contractual rights, minor disputes to enforce them**." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108 (Flight Options I)*, 863 F.3d 529, 538 (6th Cir. 2017) (*quoting Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n,* 491 U.S. 299, 302 (1989) (internal quotation marks omitted, emphasis added). Minor disputes involve "interpretation or application of particular provisions of existing collective bargaining agreements," *United Transp. Union v. Cuyahoga Valley Ry. Co.*, 979 F.2d 431, 434 (6th Cir. 1992), and are committed to grievance arbitration. *See Flight Options I,* 863 F.3d at 539.

Moreover, "Courts apply a strong presumption in favor of finding a minor dispute." *Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div. v. CSX Transp., Inc.*, No.: 1:21-cv-01240, 2022 WL 524772, at *4 (N.D. Ohio Feb. 21, 2022) (Gwin, J.) Where "an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by

9

the terms of the parties' agreement (*i.e.*, the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board" and dismiss the case. *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 310 (1989). The Supreme Court has explained that the RLA places a "relatively light burden" on a railroad to show that a dispute is minor and must go to arbitration. *Id*. at 307. "[S]o long as the party's proffered interpretation is not 'frivolous or obviously insubstantial,' the dispute is minor." *Flight Options II*, 873 F.3d at 544 (*quoting Conrail*, 491 U.S. at 307).

### III. Decision

Plaintiff BLET and Defendant NSR have presented this Court with a *minor* dispute, because the 2015 CBA does not expressly address the issue and the terms of the 2015 CBA, as well as the 2016 Flowback Agreement, does not preclude Defendant from calling Engineers to work as Conductors (or disciplining those who refuse to do so). Having reviewed the entirety of the 2015 CBA and the 2016 Flowback Agreements, neither prohibits Defendant NSR from calling an engineer, who has not opted to be designated flowback, to protect a conductor vacancy. Furthermore, the language in the Flowback Agreements arguably lends support to Defendant's position that it has the authority to do so, or, at the very least, renders Defendant's position non-frivolous. In other words, while Plaintiff maintains Defendant's practice violates the terms of the 2015 CBA, neither party points to any language in that agreement that *clearly and unambiguously* prohibits or allows such a practice. While it is Plaintiff's position that Defendant's practice is inconsistent with the PWS system established by 2015 CBA, such a position is a matter of interpretation, and is a hallmark of a minor dispute.

In addition, the parties' past practice supports the finding that Defendant NSR was

interpreting the existing 2015 CBA and 2016 Flowback Agreements, and not attempting to create new contractual rights that were expressly precluded by these agreements.

As the Court finds a minor dispute, it lacks jurisdiction to decide this matter under the Railway Labor Act.

A.  **Collective Bargaining Agreement and Flowback Agreements**

Defendant need not persuade the Court that its interpretation of the agreements is correct, nor does it have a substantial burden to show that its interpretation of said agreements is not frivolous or insubstantial. As set forth above, courts apply a strong presumption in favor of finding a minor dispute. Past practice, which will be discussed in the following section, is considered only to determine whether the employer has made a non-frivolous argument.

It bears observing at this point that the parties do not dispute that it is a common practice for engineers to work as conductors to cover vacancies and that occurs with great frequency. (See R. 47-1, PageID# 1102-1103; R. 51-2, PageID# 1470 (asserting "8,461 instances of Engineers being called to protect trainman vacancies between 2015 and 2020")). Rather, Defendant asserts that it has the right to require an engineer to cover a temporary conductor vacancy when the necessity arises, whereas Plaintiff asserts that the vast majority of these instances involve engineers "voluntarily" filling conductor vacancies. (R. 47-1, PageID# 1102-1103).[6]

Plaintiff argues that "[b]y the plain and unambiguous terms of Article V of the 2015 Agreement, PWS is the sole and "exclusive method to assign engineers," (emphasis added) and

---

[6] Defendant denies this latter assertion by Plaintiff, and further indicates that its records do not track whether an engineer was "forced" to cover a shift or did so "voluntarily" given its position that an engineer does not have a right to refuse and would be disciplined for doing so. (R. 49, PageID# 1373; R. 51, PageID# 1458).

11

NSRC is not permitted to force engineers to accept any assignments other than those assigned through the PWS process." (R. 47-1, PageID# 1080). The Court cannot find that the language of the 2015 CBA is plain and unambiguous on this issue. As discussed below, there is a long-standing thirty year dispute as to whether an employee, including engineers, can be disciplined for not protecting a vacancy, including a conductor vacancy. Also, as discussed in the section below and as set forth above in the relevant facts section, Defendant has long maintained and enforced its position that it can discipline employees who refuse such assignments, and several arbitral decisions have agreed. Given this backdrop, the mere inclusion of the term "exclusive" is hardly sufficient to resolve this issue. Indeed, if the parties wanted to specifically address this issue in the 2015 CBA, they could easily have done so. Instead, the 2015 CBA is completely silent on the issue of engineers working *as conductors* or the manner in which they may be assigned.

The only reference to such work comes in the parties' "Agreed to Questions & Answers" concerning Professional Performance Incentive ("PPI"), which is referenced in Article III of the 2015 CBA and indeed contemplates engineers would also work in "other crafts:"

> Q3: How will engineers *who work as an engineer and in other crafts* during the same quarter be handled for PPI eligibility?
>
> A3: The performance criteria will be based on service as an engineer. The calculation of the incentive amount will be based on engineer earnings as defined by Article III, Section 2(b) of this Agreement.
>
> Q4: How will DDOs [Designated Days Off] be handled when an engineer is working in another craft?
>
> A4: A DDO may only be scheduled and taken when an engineer is holding an engineer assignment.

(R. 45-2, PageID# 833, 837-838, Exhs. T & U) (emphasis added).

Furthermore, the Declaration of NSR Vice-President Shepard avers that "temporary vacancies arise throughout the week for a variety of reasons;" that by the very nature of these unplanned and unanticipated vacancies "[t]he parties could not possibly use the PWS system, with its fixed, weekly bidding schedule, to fill such vacancies;" and that "[i]n the event there are no employees assigned to the applicable Extra Board available, [Defendant] … will turn to computerized 'Decision Tables' to call all rested and qualified employees until the unplanned vacancy is filled." (R. 45-2, PageID# 737-738, Decl. of Shepard at ¶¶ 36-37).

Plaintiff's argument that the Flowback Agreements are immaterial to the present dispute—because it only applies to demoted engineers—is unconvincing. (R. 50, PageID# 1398-1400). Two of the three 2016 Flowback Agreements contain the following language: "The parties agree that the *process* by which temporary engineer vacancies are filled *remains unchanged* by the terms of this Agreement, except *engineers in train service* as a result of this Agreement will be called *after other demoted engineers* to protect temporary engineer vacancies." (R. 45-2, PageID# 769, 774, Exh. C) (emphasis added). This language undermines Plaintiff's position that the Flowback Agreements only allow for demoted engineers to flowback to protect conductor vacancies. The agreements further state that even engineers "who are *not* designated as flowback **will be sent to train service in reverse seniority order**" when necessary. (R. 45-2, PageID# 769, 774, Exh. C) (emphasis added). Moreover, the very presence of the Flowback Agreements is indicative of the large gaps in the 2015 CBA, which does not in any fashion preclude the carrier from calling engineers to work temporarily as conductors.

Defendant has likened this matter to a recent decision from this district court—*Int'l Ass'n of Sheet Metal, Air, R. & Transp. Workers – Transp. Div. v. CSX Transp., Inc.*, where the collective bargaining agreement did "not say what should happen after the employer exhausts the

13

agreed-upon vacancy fill logic." 2022 WL 524772 (N.D. Ohio, Feb. 21, 2022) (Gwin, J.). Plaintiff attempts, unsuccessfully, to argue the case is distinguishable because "[i]n that case, the labor agreement was ***silent*** on how to fill certain temporary vacancies and the employer enacted a policy to fill in the gap consistent with past practice." (R. 50, PageID# 1398) (emphasis in original). While Plaintiff avers the 2015 CBA contains a "labor agreement [that] has an express, clear, and binding method to fill vacancies," the Court does not agree. *Id*. The 2015 CBA says absolutely nothing about engineers filling conductor vacancies despite the practice being longstanding and widespread.

The Court agrees with the above decision, and faced with this silence or ambiguity in the 2015 CBA, applies the presumption in favor of finding a minor dispute. It is not the Court's function to decide which party has offered a more persuasive interpretation of the 2015 CBA. However, the Court is unconvinced that the language of the 2015 CBA should be read as expressly prohibiting the disputed practice. The 2015 CBA, in conjunction with the flowback agreements and past practice discussed *infra*, provides ample support for finding Defendant's position is not frivolous, insubstantial, or asserted in bad faith.

**B.      Past Practice**

The parties' past practice with respect to this issue supports a finding that the existing dispute is a minor one.

When evaluating a claim under the RLA, courts may consider past practices to decide whether the collective bargaining agreement arguably supports a party's proffered interpretation. *See, e.g., Flight Options I*, 863 F.3d at 542 ("A claim is 'arguably justified' if any reasonable labor arbitrator, applying appropriate principles of contract interpretation and after reviewing relevant extrinsic evidence (such as evidence of past practice), could find that the contract *does*

14

*justify* a party's claimed right to take, or to refrain from taking, an action."). The "relevant terms" of an agreement are not confined to those that are written down; "they also include the parties' practice, usage, and custom as they carry out their agreement." *Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2017). This Court's role is *not* to utilize past practice to actually decide the exact scope of an employer's authority under the collective bargaining agreement, as "[w]ading through the competing declarations to determine the actual authority the Railroad had to modify the disciplinary policies, based on past practices, is a job for the arbitrator." *Id*. at 759.

Here, the dispute over whether the railroad has "the right to use engineers to fill conductor vacancies" has a thirty-plus year history. The Court will not recount all the relevant facts set forth above. However, to summarize, a neutral arbitrator in 1991 found an engineer was "obligated" to work as an emergency conductor. (R. 45-2, PageID# 803, Exh. N, Award No. 32 of Public Law Board 4417).

Back in 1993, Plaintiff's predecessor and Defendant settled a similar grievance by mutually agreeing that "conductor and trainman positions" could be filled by engineers in an emergency after exhausting the ranks of conductor and trainman. (R. 45-2, PageID# 779, Exh. D).

In 2000, Defendant sent Plaintiff's chairman a letter expressly setting forth its position that that "the Carrier has the right to use engineers to fill conductor vacancies. This right is confirmed by prior understandings, time claims, claim settlements, and arbitration decisions with your Organization. In light of the above, there is absolutely no basis for your assertion that this issue rises to the level of a major dispute." (R. 45-2, PageID# 781, Exh. E).

In 2003, a letter to the Plaintiff's chairman from Defendant asserted that "[t]he Carrier

15

has consistently maintained and arbitral decisions have upheld that engineers must protect their seniority as conductors in emergency situations. The Carrier's practice for at least fifteen years has been to use engineers in the order of their conductor seniority when all train service sources of supply have been exhausted." (R. 45-2, PageID# 783, Exh. F). In the same year, a Public Law Board "urge[d] the parties to continue their previous broad discussions on this general topic as detailed in the Organization's submission and to reach an agreement to avoid any continuing future disputes on the manner, extent, pay and discipline regarding the utilization of demoted engineers working under the Conductors' Schedule Agreement who are utilized to protect, temporary engineer assignments." (R. 45-2, PageID# 825, Exh. R).

During a 2011 dispute between SMART-TD's predecessor and Defendant concerning whether a furloughed conductor should have been called to fill a temporary vacancy over an engineer, a neutral arbitrator noted that "[i]t has been held on a number of occasions over the years that there may be occasion for an employee from a different class or craft of service to be used for a temporary vacancy when no one is available to fill a must need position." (R. 45-2, PageID# 807, Exh. P, Award No. 76 of Public Law Board 5811).

The parties were indeed free to resolve this long-standing disagreement, and essentially alter the outcomes of the prior arbitrations when they entered into the 2015 CBA. Given the lack of any explicit discussion of this practice, the Court cannot accept Plaintiff's position that the PWS scheduling agreement somehow silently put an end to this long-standing practice. As such, past practice overwhelmingly supports the conclusion that Defendant has a non-frivolous position. As such, this dispute is minor and must proceed to arbitration.

### IV. Conclusion

For the foregoing reasons, the Court finds that the parties have a minor dispute.

Defendant's motion for summary judgment (R. 45) is hereby GRANTED, while Plaintiff's motion for summary judgment (R. 47) is DENIED. The Court DISMISSES this case for lack of subject-matter jurisdiction.

       IT IS SO ORDERED.

                                       s/ *David A. Ruiz*
                                       David A. Ruiz
                                       United States District Judge

Date: September 24, 2025